**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

AMY JANE AGNEW,

                      Plaintiff,

          -v-                                  6:23-CV-1610 (AJB/ML)

MICHAEL D'AMORE _et al._,

                    Defendants.

_____

**APPEARANCES:**                                  **OF COUNSEL:**

SHANIES LAW OFFICE                DAVID B. SHANIES, ESQ.
Attorneys for Plaintiff                  TRISTAN M. ELLIS, ESQ.
110 West 40th Street, 10th Floor
New York, NY 10018

NEW YORK STATE                      TIMOTHY P. MULVEY, ESQ.
OFFICE OF THE ATTORNEY GENERAL
Attorneys for Defendants
300 South State Street, Suite 300
Syracuse, NY 13202

**Hon. Anthony Brindisi, U.S. District Judge:**

<u>**DECISION and ORDER**</u>

## I.    INTRODUCTION

Amy Jane Agnew ("plaintiff"), a civil rights attorney, has filed this 42 U.S.C. § 1983

action alleging that corrections officers and administrators at the New York State Department of

Corrections and Community Supervision ("DOCCS") violated her constitutional rights by

barring her from conducting "contact" visits with her incarcerated clients at the Marcy

Correctional Facility ("Marcy").

More specifically, Agnew claims that Michael D'Amore, Jason M. Silipo, Sr., Christopher J. Dillon, Aimee A. Auricchio, and Cathy Y. Sheehan (collectively, "defendants") fabricated allegations that she behaved in a sexually inappropriate manner with her clients at Marcy to justify revoking her contact visitation privileges, when their actions were in fact motivated by her constitutionally protected advocacy on behalf of inmates and her sex.

Following a withdrawn request for a preliminary injunction and some initial discovery disputes, defendants moved under Federal Rule of Civil Procedure ("Rule") 12(b)(6) to dismiss the amended complaint, arguing that it failed to state a claim for which the Court can grant relief. Agnew opposed, and defendants served a reply. Subsequently, this case was reassigned from Senior U.S. District Judge Glenn T. Suddaby to this Court.

Having been fully briefed, defendants' motion to dismiss will DENIED based on the parties' submissions without oral argument.

## II.    BACKGROUND[1]

Amy Jane Agnew is an attorney. FAC ¶ 11. She is also a woman. *Id.* ¶ 151. Much of her work entails representing incarcerated individuals, with a focus on access to healthcare and disability-related services. *Id.* ¶¶ 11, 20. In addition to Agnew's legal practice, she regularly engages in public advocacy through the media, education campaigns, and other means. *Id.* ¶ 22. This advocacy sometimes includes criticizing prison policies and individual instances of mistreatment, which in turn motivates her legal work. *Id.* As such, she considers her law firm "akin to a prisoners' rights advocacy group." *Id.*

Agnew has a long history of challenging New York prison officials' actions. She has litigated against DOCCS and its employees for approximately a decade. FAC ¶ 20. At the time

---

[1] These facts are drawn from Agnew's first amended complaint. Dkt. No. 12, Am. Compl. ("FAC").

of filing, among her clients were "several hundred" individual inmates and two certified classes, including a group of about 3,000 inmates across various DOCCS facilities in a case called *Allen v. Koenigsmann* in the Southern District of New York, which remained pending when Agnew filed this action. *Id.* ¶ 19.

Many of Agnew's clients have brought claims against DOCCS officials at Marcy, a single-sex men's facility, specifically.[2] *See, e.g.*, FAC ¶¶ 41–44. *Allen*, for example, included claims by approximately thirty Marcy inmates regarding the provision of constitutionally inadequate healthcare. *Id.* ¶ 42. And in *Bushey v. Dinello* in the Northern District of New York, Agnew represented an inmate who claimed that Marcy staff had improperly deprived him of necessary medical services. *Id.* ¶ 43. After Agnew won a consent order for *Bushey* in 2022, a wave of additional Marcy inmates contacted Agnew's firm to pursue potential civil rights claims. *Id.* ¶¶ 43, 49.

As part of her work representing inmates, Agnew regularly meets with clients at DOCCS facilities, including Marcy. FAC ¶ 23. Like other attorneys, she often begins these meetings with handshakes or hugs and exchanges paperwork with clients while discussing their cases. *Id.* ¶¶ 24–26. Indeed, to the best of Agnew's knowledge, DOCCS employees have never accused a male attorney of violating visitation policies or otherwise engaging in inappropriate behavior for greeting an incarcerated client with a hug. *Id.* ¶¶ 27, 151. And DOCCS visitation policies generally allow this behavior. *Id.* ¶ 27.

One such policy is Directive 4404 (the "Directive"), which governs legal visits between inmates and their attorneys. FAC ¶ 28. The Directive provides that legal visits' sole purpose is

---

[2] The Court takes judicial notice that Marcy is a single-sex facility. N.Y. State Dep't of Corr. & Cmty. Supervision, Directive No. 92 (Jan. 19, 2024) ("Marcy is used for the general confinement of males 18 years of age or older."); *Marcy Correctional Facility*, N.Y. State Dep't of Corr. & Cmty. Supervision, https://doccs.ny.gov/location/marcy-correctional-facility ("Marcy Correctional Facility is a medium security level facility for males.").

to discuss confidential legal matters and that, "[i]n general, all legal visits shall be contact visits." *Id.* ¶¶ 29, 32.  Contact visits permit certain physical contact and take place in rooms without physical barriers, whereas no-contact visits prohibit such contact and take place in rooms with partitions.  *Id.* ¶ 34.  The partitions can prevent inmates and attorneys from exchanging documents, since they typically lack slots or other openings.  *Id.*

The Directive sets out some limitations on legal visits.  For example, inmates' and attorneys' ability to exchange documents is "subject to an inspection for contraband."  FAC ¶ 33.  Facilities' superintendents can also "suspend[ ] contact visit privileges" if they receive "the opinion of Counsel's Office" before doing so.  *Id.* ¶ 32.  And on the same condition, the Directive allows superintendents to deny contact visits "for good cause," *i.e.*, when necessary for "safety, security, and/or good order."  *Id.* ¶ 31.  Beyond the restrictions outlined in the Directive, however, "a facility or institution may not impose any further restrictions without the prior approval of the Counsel to [DOCCS]."  *Id.* ¶ 30.

Against this backdrop, the events underlying Agnew's amended complaint took place.

On September 30, 2022, Agnew and a male attorney from her firm, Joshua Morrison, traveled to Marcy to meet with nine inmate clients.  FAC ¶ 53.  Two were unavailable, one was in a separate mental health unit, and the other six were scheduled to meet with the attorneys in the general visiting room.  *Id.* ¶¶ 54–55.  While Agnew had represented those six inmates for approximately four years, that day—for the first time and without explanation—their legal visits were limited to thirty minutes.  *Id.* ¶¶ 56–57.  Still, contact was permitted, and both Agnew and Morrison hugged at least one client, Aaron Dockery, during their meeting.  *Id.* ¶ 62.

After Agnew and Morrison left, prison officials called one of the men they had just visited, Larry Rau, into the office of Marcy's then-deputy superintendent for security, William J.

Snyder. FAC ¶ 65. Snyder repeatedly asked Rau about Agnew's activities at Marcy, but Rau declined to give Snyder any information. *Id.* Afterward, officials confiscated some of Agnew's clients' extra mattresses, which had been provided for medical reasons, and warned one to "stop talking to lawyers." *Id.* ¶ 66.

In October 2022, defendant Michael D'Amore began working as Marcy's first deputy superintendent. FAC ¶¶ 50–51. As detailed below, Agnew's business at Marcy, including additional client and witness meetings, continued during D'Amore's tenure.

On January 12, 2023, as part of the *Allen* case, Agnew deposed Amy Ferguson, a nurse practitioner at Marcy accused of unjustifiably stopping some inmates' medications. FAC ¶ 68.

The next day, January 13, 2023, Agnew visited Marcy to prepare clients Dockery, Claudio Johnson, Troy Warren, and Mali Wilkerson to testify in a preliminary injunction hearing in *Allen*. *Id.* ¶ 69. While Agnew and her clients met in the visiting room, they were not provided with a space to speak privately, and corrections officers "lingered close by" during the meetings. *Id.* ¶¶ 71–72. At the outset, Agnew greeted Dockery and Johnson with hugs. *Id.* ¶ 70. She did not touch Warren, and she may have, at most, knelt in front of Wilkerson's wheelchair. *Id.* She never left the visiting room to speak with any officer. *Id.* ¶ 72.

In February 2023, over the objections of Marcy's then-superintendent, Patrick Reardon, Agnew secured the testimony of Ferguson, the nurse practitioner she had deposed, in an evidentiary hearing in *Allen*. FAC ¶¶ 74–75. After the evidentiary and preliminary injunction hearings, Agnew's firm began to receive even more mail from inmates alleging improper uses of force, medication denials, and "other forms of retaliation" by Marcy officials. *Id.* ¶ 76.

Agnew herself began to face additional difficulties at Marcy, as well. On March 9, 2023, she and Morrison returned to the facility to meet with ten clients. FAC ¶ 77. That day, defendant

Aimee Auricchio, a corrections officer, told the attorneys that they would not be allowed to exchange papers with their clients, even though, in general, they otherwise could do so. *Id.* ¶ 78.

The meetings proceeded anyway. In the visiting room, Agnew and Morrison sat opposite their clients at an approximately three-foot-wide table, with their backs to the officers' desk. FAC ¶ 82. Agnew did not hug any of the inmates she saw that day, since she was meeting them for the first time. *Id.* ¶ 79. She did, however, place a hand on new client Israel Guerrido's shoulder as he recounted the difficulty of maintaining contact with his children while incarcerated and expressed his concerns about being retaliated against for participating in litigation against Marcy officials. *Id.* And at another point, while Morrison spoke with a different client, Agnew got up from her seat and sat separately with—but did not touch—Gaetano Tagliaferro. *Id.* ¶ 83.

Although exchanging papers was not permitted on March 9, sometime that day a client gave Agnew a document wrapped in a grievance form. FAC ¶ 80. Auricchio tried to confiscate the document after the visit. *Id.* Agnew gave Auricchio the grievance form but not the document inside it, since the latter included privileged and confidential information. *Id.*

The next day, March 10, 2023, Agnew and Morrison met with ten additional clients at Marcy. FAC ¶ 85. Once again, the attorneys sat across from their clients at a table in the visiting room, their backs to corrections officers. *Id.* ¶ 86.

On March 14, 2023, the week after Agnew's and Morrison's visits, a "medication run," in which corrections officers take inmates to retrieve prescription medications, took place at Marcy. FAC ¶ 88. During this medication run, officers made inmates wait outside in snowy, freezing conditions for prolonged periods, for which one officer told inmates that they could "thank the inmates who contacted lawyers." *Id.* ¶ 88–89. Around the same time, Agnew's firm had been

looking into reports of abuse during other medication runs at Marcy.  *Id.* ¶ 88.  She continued to investigate these allegations afterwards.  *See id.* ¶¶ 90–93.

On March 28, 2023, Agnew wrote then-superintendent Reardon and chief medical officer Carol Moores to ask them to allow an outside periodontist into Marcy to examine twenty-six inmates with gum and dental issues.  FAC ¶ 93.  Reardon and Moores never responded, effectively denying the request.  *Id.*  When Agnew had previously sought external medical attention for DOCCS inmates she represented, her requests had never been denied.  *Id.*

On March 31, 2023, the Southern District of New York certified the *Allen* class, which included at least thirty-nine Marcy inmates.  FAC ¶ 94.

On April 7, 2023, Agnew again wrote to Reardon and Moores to ask for a periodontist to examine her clients at Marcy.  FAC ¶ 95.  She again received no response.  *Id.*  Agnew made the same request a third time on April 15, 2023, then including Mark Richter and defendant Cathy Sheehan, both DOCCS attorneys.  *Id.* ¶ 96.  And for a third time, no one ever responded.  *Id.*

Agnew's difficulties at Marcy continued into the summer of 2023.  As was customary, her firm had hired a group of law students as summer interns, and directed them to interview members of the *Allen* class ahead of proceedings scheduled for August 2023.  FAC ¶¶ 97–98.  The firm obtained an order from the Southern District of New York granting the interns access to more than 100 class members across more than seventeen DOCCS facilities, including Marcy.  *Id.*  Armed with the order, and having completed training on DOCCS policies and procedures, the interns' work began smoothly.  *Id.* ¶¶ 98–99.

That was, at least, until July 12, 2023, when they visited Marcy.  FAC ¶ 99.  On that day, four interns had planned to meet with eleven inmates regarding *Allen*.  *Id.*  They were processed into the facility and the first round of interviews began without issue.  *Id.* ¶¶ 100–01.  As with

Agnew's client meetings in March, though, corrections officers remained in the visiting room, within earshot of the interns' conversations. *Id.* ¶ 102. The interns had not experienced this much supervision from officers at other DOCCS facilities, and it made them uncomfortable. *Id.* Yet they went on.

During the first round of interviews, however, officers informed the interns that the rest of their visits would be no-contact. *Id.* ¶ 103. Before conversations could resume, the officers moved the inmates out of the main visiting area to a separate location behind glass-and-mesh partitions. *Id.* ¶ 104. The partitions had no openings through which to pass documents, and they made it more difficult—and in some cases impossible—for the interns and inmates to hear each other and communicate effectively. *Id.* ¶¶ 104–06.

When one of the interns, Shira Nabatian, asked why the visits had been changed from contact to no-contact, and whether this decision could be reversed, an officer responded that he could not do anything because the directive had come from "higher up." FAC ¶ 106–07. Nabatian arranged to speak with a sergeant. *Id.* ¶ 107. After trying to speak with another corrections official through one of the partitions, the sergeant agreed that the arrangement made communicating more difficult. *Id.* ¶ 108. But the most he could offer the interns was to allow the inmates in wheelchairs to move to a different part of the visiting room, where they could more easily position themselves closer to the partitions. *Id.* ¶¶ 109–10. The no-contact setup ultimately remained in place, frustrating the interns' work. *Id.* ¶ 110.

Upon leaving Marcy, the interns asked the corrections officer at the front desk why their visits had been changed to no-contact. FAC ¶ 111. The officer ventured that it was because of their association with Agnew's firm. *Id.* When the interns returned the next day to meet with seven other inmates, they were still limited to no-contact visits. *Id.* ¶¶ 112–13.

Later in July 2023, the *Allen* defendants sought to depose twenty-one inmate witnesses. FAC ¶ 114.  With the interns' recent experience at Marcy in mind, Agnew preemptively obtained an order from the Southern District of New York requiring that the depositions take place in person via contact visits.  *Id.* ¶¶ 114–15.  But the order did not solve her problems.

On August 2, 2023, Agnew went to Marcy to defend *Allen* depositions and interview class member Frank Annunziata.  FAC ¶ 116.  To her surprise, before the interview began a corrections officer placed Annunziata behind a partition in the visiting room.  *Id.* ¶ 117.  Agnew asked whether Annunziata was under any sanctions requiring no-contact visits, and the officer said he was not.  *Id.* ¶ 120.  Instead, the officer told Agnew that the restriction was hers: from that point forward, all of her legal visits at Marcy would be no-contact.  *Id.*

Agnew demanded an explanation and sought to speak with the officer's supervisor.  FAC ¶ 122.  She got no response.  *Id.*  She explained that she had a court order allowing her to conduct contact visits.  *Id.* ¶ 123.  This, too, led nowhere.  *Id.* ¶ 124.  Finally, she had her office reach out to a lawyer for DOCCS, Oriana Kiley, for assistance.  *Id.*  But rather than restoring Agnew's ability to have contact visits, Kiley canceled the rest of the depositions that had been scheduled for that afternoon.  *Id.*

Agnew's Marcy-related difficulties came to a head soon afterwards.  In a hearing on August 14, 2023, the Southern District of New York directed D'Amore, who by then had become superintendent, to explain why Agnew had been denied contact visits despite the court order that should have allowed them to proceed.  FAC ¶ 125.  Appearing on his behalf, Kiley produced a declaration signed by D'Amore and dated August 10, 2023 (the "Declaration"), which stated that Agnew lost contact visitation privileges because she had been sexually inappropriate with

inmates during previous contact visits. *Id.* ¶¶ 126, 128. Agnew maintains that the Declaration was "false, outrageous, and defamatory." *Id.*

The Declaration relied on writings by other Marcy officials. Defendant Jason M. Silipo, Sr., a corrections officer at Marcy, prepared two of these documents. FAC ¶¶ 13, 131–33. In one, dated January 13, 2023, Silipo wrote that, "[t]oday," he saw Agnew "hug an incarcerated individual" during a visit, overheard them "have a personal conversation . . . that didn't pertain to a legal case," and then spoke to Agnew in a hallway about her conduct. *Id.* ¶ 132. And in the other, dated August 8, 2023, Silipo added a fact about Agnew's daughter and otherwise reiterated the same points. *Id.* ¶¶ 133–34, 136. Agnew denies having spoken with any officer outside the visiting room on January 13. *Id.* ¶ 72.

Indeed, a closer look at Silipo's first memorandum dented his credibility. While it was dated January 13, 2023, its letterhead listed Daniel F. Martuscello III as DOCCS's acting commissioner and D'Amore as Marcy's superintendent. FAC ¶ 136. Yet Martuscello and D'Amore did not assume those roles until May 18 and June 1, 2023, respectively. *Id.* So, it appeared that Silipo had prepared the document not on January 13, 2023, but at least four-and-a-half months later. *Id.* ¶¶ 137–38.

A document signed by defendant Christopher J. Dillon, another corrections officer at Marcy, suffered from the same defect. FAC ¶¶ 14, 139. Dated March 10, 2023, and outlining allegations of "inappropriate contact" between Agnew and one or more inmates, Dillon's memorandum was printed on the same letterhead from June 2023 or later. *Id.* ¶ 139.

The same was true of two documents signed by Auricchio, the Marcy corrections officer who told Agnew and Morrison that they would not be allowed to exchange documents with inmates on March 9, 2023. In a memorandum bearing that date, Auricchio claimed to have seen

Agnew "inappropriately touch" and have "personal conversations" with inmates.  FAC ¶ 141.  In another, from August 8, 2023, Auricchio repeated the same claims verbatim, adding, "Amy Agnew inappropriately touched multiple [incarcerated individuals'] shoulders and thighs, along with greeting them by hugging."  *Id.* ¶ 143.  Agnew denies this.  As detailed above, during the legal visits on March 9, 2023, Agnew placed a hand on a client's shoulder as he worried about communicating with his children while incarcerated and facing retaliation from prison officials, and she later moved from her seat to sit closer to another client, but she did not hug anyone.  *Id* ¶¶ 79, 83.

As to the remaining defendants, Agnew alleges that D'Amore and Sheehan "jointly participated in the creation of the falsified reports by encouraging, directing, and/or assisting Defendants Auricchio, Dillon, and Silipo, and others, in the creation of those documents."  FAC ¶ 145.  And Agnew asserts that all five defendants knew that the information contained in the memoranda was false.  *Id.* ¶ 146.

Moreover, in stark contrast to her own experiences, Agnew knows of no adverse actions DOCCS employees have taken against a male attorney for hugging clients, nor any false accusations that a male attorney inappropriately touched clients, during legal visits.  FAC ¶¶ 148, 151.  And even after defendants lodged the allegedly false claims against Agnew, Marcy staff continued to allow Morrison, her male colleague, to conduct contact visits at the facility, despite the fact that he, too, had hugged clients during previous visits.  *Id.* ¶ 149.

Thus, the core of Agnew's complaint: partly in retaliation for her advocacy on behalf of inmates, and partly because of her sex, defendants fabricated grounds to deny her the ability to conduct contact visits at Marcy, violating her rights under the First and Fourteenth Amendments.

Based on these allegations, Agnew filed this three-count action under § 1983 on December 20, 2023.  Compl.  She filed an amended complaint, asserting the same substantive claims with additional detail, on February 7, 2024.  FAC.

Contentious motions practice and discovery followed.  On February 13, 2024, Agnew sought an order to show cause and moved for a preliminary injunction to be able to resume contact visits at Marcy as quickly as possible.  *See* Dkt. No. 14.  Judge Suddaby denied the former, Dkt. No. 16, and defendants opposed the latter, Dkt. No. 20.

On March 7, 2024, Agnew filed a motion to expedite discovery, Dkt. No. 22, which Judge Suddaby granted in part, Dkt. No. 27.  Afterwards, Agnew repeatedly protested that defendants were failing to timely follow discovery orders and fully respond to discovery demands.  *See* Dkt. Nos. 28, 35.  The delay led Agnew to seek a writ to compel the testimony of twelve witnesses, including defendants, Dkt. No. 32, and ultimately to withdraw her motion for a preliminary injunction, Dkt. No. 35.

On June 21, 2024, defendants moved under Rule 12(b)(6) to dismiss Agnew's amended complaint for failure to state a claim.  Dkt. No. 40.  Agnew opposed on July 26, 2024, Dkt. No. 43, and defendants filed a reply on August 2, 2024, Dkt. No. 44.  This case was reassigned to this Court on February 6, 2025.  Dkt. No. 45.

## III.    LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, the complaint's factual allegations must elevate the plaintiff's right to relief above the speculative level.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  While legal conclusions can provide a framework for the complaint, they must be supported by meaningful factual allegations.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679

(2009).  In short, a complaint must contain "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.

To assess the plausibility requirement, the Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the non-movant's favor.  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  In doing so, the Court generally confines itself to allegations in the pleading, any documents attached to the complaint or incorporated to it by reference, and matters of which judicial notice may be taken.  *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (quoting *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 51 n.2 (2d Cir. 2016)).

## IV.    DISCUSSION

Agnew's amended complaint asserts three causes of action, each under § 1983 and against all five defendants: First Amendment retaliation ("Count One"), unlawful sex discrimination in violation of the Equal Protection Clause ("Count Two"), and selective enforcement and/or class-of-one discrimination in violation of the Equal Protection Clause ("Count Three").  FAC ¶¶ 158–74.

Defendants have moved under Rule 12(b)(6) to dismiss all counts.  Dkt. No 40-1.  As to Count One, defendants argue that Agnew has failed to state either a causal connection between her protected conduct and their actions or a chilling effect on her activity.  *Id.* at 10–15.  They contend that Counts Two and Three are defective because Agnew has not adequately pleaded disparate treatment based on sex or any other factor.  *See id.* at 17–18.  And they further claim that Count Three must be dismissed because Agnew has not identified a similarly situated person whom defendants have treated more favorably.  *Id.* at 19–22.

For the reasons outlined below, all of Agnew's claims are plausibly alleged.

### A.    Personal Involvement Under § 1983

In arguing, as to Count One, that Agnew did not adequately plead a causal connection between her protected conduct and defendants' actions, defendants contend that "the amended complaint is replete with references to 'Marcy staff', not the actions or statements of the individual defendants in this case."  Dkt. No. 40-1 at 12–13 (quoting FAC ¶¶ 6–7).  Whatever this argument's possible merits as to Agnew's retaliation claim, it raises the universal question of "personal involvement" under § 1983.

Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . ."  42 U.S.C. § 1983.

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation."  *Grullon v. City of New Haven*, 720 F.3d 133, 138–39 (2d Cir. 2013) (collecting cases).  "Personal involvement is a question of fact and must be satisfied as to each individual defendant."  *Cabassa v. Oshier*, 2013 WL 1183296, *8 (N.D.N.Y. Mar. 21, 2013).  This requirement applies equally to supervisors.  *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (observing "there is no special rule for supervisory liability" under § 1983).

Defendants do not argue that Agnew failed to plead that they were personally involved in the asserted rights violations.  *Cf.* Dkt. No. 40-1.  But they raise the issue by highlighting Agnew's references to "Marcy staff" and related generalized terms.  *Id.* at 12–13 (quoting FAC

¶¶ 6–7).  Nevertheless, as detailed below, defendants' alleged conduct satisfies the personal-involvement requirement for each claim.

### B.    Agnew Has Adequately Pleaded First Amendment Retaliation

"[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out."  *Hartman v. Moore*, 547 U.S. 250, 256 (2006).

"To plead a First Amendment retaliation claim a plaintiff must show: (1) [s]he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by [her] exercise of that right; and (3) the defendant's actions caused [her] some injury."  *Dorsett v. Cnty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013).

Count One is adequately pleaded because (1) Agnew has a First Amendment right to engage in litigation and public advocacy on behalf of incarcerated individuals; (2) defendants allegedly barred her from conducting contact visits at least in part because of her exercise of that right; and (3) limited access to contact visits is a "concrete harm" in this context.

### 1.    The First Amendment Protects Agnew's Legal Associations and Advocacy

To state a retaliation claim, a plaintiff must first show that she engaged in protected conduct.  *Dorsett*, 732 F.3d at 160.  Agnew argues that her "policy-impact litigation and advocacy is expressive conduct protected by the First Amendment."  FAC ¶ 159.  Defendants seem to agree.  Dkt. No. 40-1 at 11 (acknowledging that First Amendment rights can encompass "'vigorous advocacy' in the litigation context" and associational relationships formed to petition the government).  Therefore, the Court considers this point conceded and analyzes it only briefly.

The Supreme Court has observed that "[t]here is no question that speech critical of the exercise of the State's power lies at the very center of the First Amendment."  *Gentile v. State*

*Bar of Nev.*, 501 U.S. 1030, 1034 (1991); *see also N.Y. Times Co. v. Sullivan*, 375 U.S. 254, 270 (1964) (recognizing, in the defamation context, "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials").

The Supreme Court has further acknowledged that "certain forms of cooperative, organizational activity, including litigation, are part of the freedom to engage in association for the advancement of beliefs and ideas, and that this freedom is an implicit guarantee of the First Amendment." *In re Primus*, 436 U.S. 412, 438 n.32 (1978) (citations omitted). This protected activity includes lawyers' associating with clients and prospective clients to engage in litigation intended to advance a perspective or political cause, such as civil rights. *See id.* at 431–32.

Agnew's advocacy, in and out of court, falls squarely within this rubric. She pursues civil rights cases to protect inmates' access to healthcare and related services, and her work routinely involves challenging DOCCS actions and policies through various means, including but not limited to speaking with the media and litigating. FAC ¶¶ 19–22. She expressly characterizes her firm as "akin to a prisoners' rights advocacy group." *Id.* ¶ 22. And when she learned that she had been barred from conducting contact visits at Marcy, she was actively representing thirty-nine class members housed there in a civil rights suit—to say nothing of the approximately 3,000 *Allen* class members at other DOCCS facilities or Agnew's individual clients at Marcy. *Id.* ¶¶ 94, 116. Thus, Agnew has plausibly alleged that she was engaged in conduct protected by the First Amendment.

2.      **The Timing of Defendants' Actions Suggests Retaliatory Motivations**

Next, a plaintiff must allege that defendants retaliated against her because of her

protected conduct. *Dorsett*, 732 F.3d at 160. Agnew asserts that defendants' "adverse actions,"

including falsifying documents supporting the Declaration and denying her contact visits, were

"a direct result" of her advocacy. FAC ¶¶ 160–61. Defendants argue that Agnew has not shown

"any credible causal connection," such as "temporal proximity or circumstantial evidence,"

between her protected conduct and their actions. Dkt. No. 40-1 at 12–13. However, precisely

because Agnew has plausibly alleged "temporal proximity [and] circumstantial evidence," this

element is satisfied, as well.

Recognizing the difficulty inherent in establishing adverse parties' motives before

discovery, the Second Circuit has held that, for the purposes of a complaint, "[i]t is sufficient to

allege facts from which a retaliatory intent . . . reasonably may be inferred." *Dougherty v. Town*

*of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 91 (2d Cir. 2002), *abrogated in part on*

*other grounds by Knick v. Township of Scott*, 588 U.S. 180, 185 (2019). "A plaintiff can establish

a causal connection that suggests retaliation by showing that protected activity was close in time

to the adverse action." *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (holding sufficient to

infer a retaliatory motive a six-month interval between the dismissal of the plaintiff's lawsuit and

his alleged beating by a defendant).

No hard-and-fast time limits govern this question. *Gorman-Bakos v. Cornell Coop.*

*Extension of Schenectady Cnty.*, 252 F.3d 545, 554–55 (2d Cir. 2001) (observing that the Second

Circuit "has not drawn a bright line to define the outer limits beyond which a temporal

relationship is too attenuated" and collecting cases). Thus, in *Gorman-Bakos*, the Circuit

concluded that the following facts were sufficient to give rise to inferences of retaliatory

motivation: "only a few days" between the plaintiffs' complaining to county officials about the defendants' behavior and the defendants' invoking health guidelines to suspend activities on the plaintiffs' farm, "[o]nly two months" between the plaintiffs' meeting with county officials and the defendants' falsely claiming that the plaintiffs had resigned from an organization the defendants oversaw, and "only three months" between that meeting and the defendants' voting to terminate the plaintiffs' membership in the same organization. *Id.* at 555.

Here, the contemporaneous—or, if analyzed with respect to discrete events, close-in-time—nature of Agnew's protected conduct and defendants' actions easily establishes a plausible inference of retaliatory motivations sufficient to survive a motion to dismiss.

### a.    Agnew's Conduct

Viewed broadly, Agnew engaged in protected litigation activity that was ongoing and contemporaneous with defendants' conduct.  In *Allen*, a civil rights case alleging that DOCCS provided constitutionally inadequate healthcare, Agnew represented a group of inmates that included at least several dozen Marcy inmates at all relevant times—first as a putative class beginning in 2019, and then as a certified class after March 31, 2023.  FAC ¶¶ 42, 94.

But taking a more piecemeal approach to Agnew's conduct would not foreclose relief. Agnew engaged in a host of discrete actions in furtherance of her protected advocacy—including, but not limited to, frequently meeting with clients at Marcy from September 2022 onward, subpoenaing a Marcy employee's testimony in February 2023, and obtaining two federal court orders (albeit to no avail) to guarantee access to contact visits during the summer of 2023, *see, e.g.*, FAC ¶¶ 53, 74, 97, 114—near enough in time to defendants' actions to infer their retaliatory intent.

### b.    Defendants' Conduct

When viewed in context, each defendant's alleged conduct confirms that Count One plausibly alleges the second element of a First Amendment retaliation claim.  *Cf.* Dkt. No. 40-1 at 14 (arguing "the amended complaint merely casts opprobrium over all 'Marcy staff'").

### i.    Michael D'Amore

D'Amore became Marcy's first deputy superintendent in October 2022 and was promoted to superintendent on May 18, 2023.  FAC ¶¶ 51, 137.  As detailed above, while DOCCS policy generally presumes that legal visits will be contact visits, superintendents can limit such visits with DOCCS attorneys' approval and on certain conditions, including, for example, when necessary to maintain order.  *See id.* ¶¶ 30–32.

On August 2, 2023, at what should have been a contact visit per a court order, Agnew learned she could no longer hold contact visits at Marcy.  FAC ¶¶ 115, 120.  During the show-cause hearing in *Allen* on August 14, 2023, D'Amore submitted the Declaration, which was dated four days earlier and included the allegedly false claims about Agnew's behavior.  *Id.* ¶¶ 126, 128.  Agnew has alleged that, in addition to exercising his authority as superintendent to limit her contact visits and signing the Declaration, D'Amore enlisted Silipo, Dillon, and Auricchio to prepare the documents upon which the Declaration relied, and that he knew they were false.  *Id.* ¶¶ 129, 145–46.  Since all of D'Amore's actions took place amid Agnew's ongoing representation of the *Allen* class (to say nothing of their proximity to her work on individual claims or other advocacy), they give rise to an inference of retaliation.

The same inference would also result from assessing the time between D'Amore's conduct and Agnew's discrete actions: Agnew met with *Allen* class members at Marcy on September 30, 2022 (a gap of ten-and-a-half months).  FAC ¶¶ 53, 57.  She deposed Ferguson,

the nurse practitioner, on January 12, 2023 (seven months).  *Id.* ¶ 68.  She met with additional *Allen* class members at Marcy on January 13, 2023 (same).  *Id* ¶¶ 69–70.  She subpoenaed and obtained Ferguson's testimony over the former Marcy superintendent's objections in early February 2023 (six-and-a-half months).  *Id.* ¶¶ 74–75.  She conducted legal visits with ten Marcy inmates on March 9, 2023 (five months).  *Id.* ¶ 77.  She met with ten additional Marcy inmates the next day (same).  *Id.* ¶ 85.  She asked Marcy officials to allow an outside periodontist to examine inmates on March 28, April 7, and April 15, 2023 (between four-and-a-half and four months).  *Id.* ¶¶ 93, 95–96.  She obtained a court order to ensure access to *Allen* class members during the summer of 2023 (at most several months).  *Id.* ¶ 97.  She sent interns to Marcy to interview *Allen* class members on July 12, 2023 (one month).  *Id.* ¶¶ 97–99.  She obtained another court order to ensure *Allen* depositions would take place via contact visits on July 25, 2023 (several weeks).  *Id.* ¶¶ 114–15.  And, finally, she attempted to defend *Allen* depositions via contact visits on August 2, 2023 (less than two weeks).  *Id.* ¶ 116.  But such a fine parsing would be redundant, as Agnew was continuously engaged in protected conduct over the relevant period.

Whether viewed as contemporaneous with, or temporally proximate to, Agnew's exercise of her First Amendment advocacy and associational rights, D'Amore's alleged conduct gives rise to an inference of a retaliatory motive.

### ii.    Jason M. Silipo, Sr.

The same is true of Silipo's actions.  Silipo prepared two allegedly false memoranda, one dated January 13, 2023, and the other dated August 8, 2023, in which he claimed to have observed Agnew act inappropriately during contact visits.  FAC ¶¶ 132–33.  The purportedly earlier memorandum's letterhead suggested it was not, in fact, created until at the earliest June 2023.  *Id.* ¶¶ 137–38.  Whatever the true date, all of Silipo's alleged conduct likewise took place

either contemporaneously with or sufficiently close to Agnew's discrete actions as described above, so it, too, gives rise to an inference of retaliation.

### iii.    Christopher J. Dillon

The document Dillon wrote in support of the Declaration, allegedly falsely describing inappropriate behavior, was dated March 10, 2023, and featured the same letterhead.  FAC ¶ 139.  Therefore, whether because Dillon's conduct took place at the same time as Agnew's ongoing representation of the *Allen* class or because it was close enough in time to her discrete actions advancing the same matter, Dillon's alleged conduct also gives rise to an inference of retaliation.

### iv.    Aimee A. Auricchio

Likewise, Auricchio prepared two documents with allegedly false allegations, one dated March 9, 2023, and the other August 8, 2023, both on the same letterhead and contemporaneous, or very near in time, to Agnew's protected conduct.  FAC ¶¶ 141, 143.  So, for the same reasons, Auricchio's alleged conduct also gives rise to an inference of a retaliatory motive.

### v.    Cathy Y. Sheehan

At first glance, it is somewhat difficult to make out Sheehan's role in the alleged scheme.  Agnew notes that Sheehan was "at all times relevant to the allegations . . . a DOCCS employee and chief counsel in DOCCS's Office of Counsel."  FAC ¶ 16.  And she alleges that, in April 2023, Sheehan was one of four DOCCS employees who did not respond to the last of her three requests for an outside periodontist to examine her clients at Marcy.  *Id.* ¶ 96.  But otherwise, the amended complaint's sometimes-overinclusive language obfuscates Sheehan's conduct.[3]

---

[3] For example, "*Defendants D'Amore, Sheehan, and/or others* enlisted Defendants Auricchio, Dillon, and Silipo in the fraud."  FAC ¶ 129 (emphasis added).  "The people involved in creating the Silipo memoranda (including *Defendants Silipo, Sheehan, and/or others*), however, overlooked an important detail."  *Id.* ¶ 135 (same).  "*Defendants D'Amore and Sheehan, and others*, jointly participated in the creation of the falsified reports by *encouraging, directing, and/or assisting* Defendants Auricchio, Dillon, and Silipo, *and others*, in the creation of those documents."  *Id.* ¶ 145 (same).

Nevertheless, Agnew has alleged enough at this stage to plausibly satisfy the personal involvement requirement of § 1983 and adequately plead First Amendment retaliation with respect to Sheehan.  That is because the amended complaint can be fairly read as claiming that Sheehan exercised her authority as DOCCS chief counsel to approve of D'Amore's decision to withdraw Agnew's contact visitation privileges, based on the false allegations of impropriety and with full knowledge of their falsity.  *See* FAC ¶¶ 30–32, 144–47.[4]  And, except as to falsity, defendants' papers acknowledge as much.  Dkt. No. 40-1 at 1 ("On or before August 2, 2023, defendant Cathy Sheehan authorized defendant Michael D'Amore to suspend plaintiff's contact visiting privileges with plaintiff's incarcerated clients at Marcy Correctional Facility.").

Sheehan's conduct likewise gives rise to an inference of retaliatory motivation.  Since Sheehan approved of D'Amore's request to bar Agnew from conducting contact visits at Marcy in early August 2023—while Agnew was litigating *Allen* or, alternatively, sufficiently near in time to the various discrete actions she took to advance the litigation—Sheehan's conduct likewise satisfies the second element of a First Amendment retaliation claim.

### 3.    The Prohibition on Conducting Contact Visits Was a "Concrete Harm"

Third and finally, to state a First Amendment retaliation claim, a plaintiff must plead an injury.  *Dorsett*, 732 F.3d at 160.  To satisfy this requirement, Agnew cites a host of defendants' actions, including "creating and publishing defamatory documents and statements, denying her the ability to have 'contact' visits with her clients, denying 'contact' visits to persons associated with her [f]irm, interfering with her attorney-client communications, and threatening her clients and potential clients."  FAC ¶ 160.  In response, defendants contend that plaintiffs generally must

---

[4] Agnew connects these dots more explicitly in her opposition to defendants' motion to dismiss.  Dkt. No. 43 at 9 (explaining that the Directive requires the DOCCS Office of Counsel to sign off on superintendents' requests to restrict attorneys' legal visits, and that Sheehan led that office when D'Amore made such a request).

allege a chilling effect, not just any injury, and that the limited other harms that courts have recognized were not present on these facts.  Dkt. No. 40-1 at 14–15.  But they are incorrect.

While alleging a chilling effect would have been sufficient, doing so was not necessary here.  *Dorsett*, 732 F.3d at 160 ("Chilled speech is not the *sine qua non* of a First Amendment Claim.  A plaintiff has standing if [s]he can show *either* that [her] speech has been adversely affected by the government retaliation or that [s]he has suffered some other concrete harm."); *Zherka v. Amicone*, 634 F.3d 642, 645 (2d Cir. 2011) ("[I]n limited contexts, other forms of harm have been accepted in place of this 'actual chilling' requirement.").

Indeed, courts have routinely recognized as sufficient a wide variety of injuries beyond chilled conduct.  *See, e.g.*, *Dougherty*, 282 F.3d at 90 (revocation of a building permit); *Zherka*, 634 F.3d at 646 (elimination of a government contract); *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 195 (2d Cir. 1994) (nonenforcement of zoning laws); *Tabbaa v. Chertoff*, 509 F.3d 82, 102 (2d Cir. 2007) (additional scrutiny at a border crossing); *Smith v. Campbell*, 782 F.3d 93, 100 (2d Cir. 2015) (issuance of three parking tickets which required either appearing in court or paying a fine); *Macera v. Vill. Bd. of Ilion*, 2019 WL 4805354, *17 (N.D.N.Y. Sept. 30, 2019) ("property damage from illegally-parked cars, harassment, reputational damage, and smoke inhalation"); *Markle v. Ulster Cnty. Res. Recovery Agency*, 2024 WL 5246014, *10 (N.D.N.Y. Dec. 30, 2024) (lost business opportunities due to being banned from a public waste disposal facility); *Vaher v. Town of Orangetown, N.Y.*, 916 F. Supp. 2d 404, 431–32 (S.D.N.Y. 2013) ("harm to [plaintiff's] professional reputation, temporary modification of his job responsibilities, further harassment and intimidation by [d]efendants and economic and pecuniary loss"); *Weinberg v. Vill. of Clayton, N.Y.*, 2018 WL 4214363, *20 (N.D.N.Y. Mar. 21, 2018) (initiation of enforcement actions); *cf. Dorsett*, 732 F.3d at 161 (finding insufficient the delayed settlement of a lawsuit

where plaintiffs had no right to a settlement by any date certain). And defendants have not even attempted to distinguish these harms from Agnew's alleged injuries.

Viewed in this legal context, cutting off Agnew's ability to conduct contact visits was injurious. Agnew has alleged that, in general, most legal visits at DOCCS facilities, including Marcy, are contact visits. FAC ¶ 32. She has alleged that contact visits better facilitate legal representation, especially as compared to no-contact visits. *See id.* ¶¶ 33–34, 38–39. And she has alleged that "'contact' visits are critical for [her] to (1) effectively communicate with her clients, (2) monitor her clients' physical conditions, and (3) exchange important documents with her clients," while "'[n]o contact' visits at best impede these necessities" and "hamper[] [her] ability to effectively advocate for her clients and advance the litigation she pursues." *Id.* ¶¶ 118– 19. Taking these claims as true, defendants' decision to prohibit Agnew from conducting contact visits made her work—as well her exercise of her protected associational and advocacy-related rights—more onerous. Thus, Agnew has adequately pleaded a "concrete harm."

Since Agnew has adequately pleaded all three elements of her First Amendment retaliation claim against all five defendants, their motion to dismiss Count One must fail.

## C.    Agnew Has Adequately Pleaded Sex Discrimination[5]

As to Count Two, Agnew claims that defendants barred her from conducting contact visits based on false allegations of sexually inappropriate behavior in part because she is a woman, in violation of her Fourteenth Amendment right to be free from unlawful sex

---

[5] Much of the authority in this section comes from the Title VII context. While Agnew's claims do not relate to employment, "in order to survive a motion to dismiss, a § 1983 plaintiff [alleging unconstitutional discrimination] 'must plausibly allege a claim under the same standards applicable to a Title VII claim," plus state action. *DiPizio v. Empire State Dev. Corp.*, 745 F. App'x 385, 388–89 (2d Cir. 2018) (summary order) (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 88 (2d Cir. 2015)); *see also Naumovski v. Norris*, 934 F.3d 200, 213–14 (2d Cir. 2019) (clarifying that § 1983 requires proving but-for causation while Title VII requires proving discrimination as a motivating factor). Since the parties do not dispute state action and this case is still at the pleading stage, the same standards apply despite the different factual setting.

discrimination.  FAC ¶¶ 163–66.  While defendants have moved to dismiss this claim, they have

offered little analysis of its supposed defects.  *See* Dkt. No. 40-1 at 15–18 (articulating legal

standards but generally failing to articulate how the pleading does not meet them).

The Equal Protection Clause mandates "that all persons similarly situated should be

treated alike."  *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  State

actors violate this command when they apply a facially neutral law in a discriminatory manner.

*Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886); *Brown v. Oneonta*, 221 F.3d 329, 337 (2d Cir.

2000) ("A plaintiff could point to a law or policy that expressly classifies persons on the basis of

race.  Or, a plaintiff could identify a facially neutral law or policy that has been applied in an

intentionally discriminatory manner.  A plaintiff could also allege that a facially neutral statute or

policy has an adverse effect and that it was motivated by discriminatory animus.").  Thus, "[t]o

state a discrimination claim under the Fourteenth Amendment Equal Protection Clause . . .

plaintiffs must sufficiently allege that defendants acted with discriminatory intent."  *Burgis v.

N.Y. City Dep't of Sanitation*, 798 F.3d 63, 68 (2d Cir. 2015).

At the motion-to-dismiss stage, a plaintiff's burden is light.  All she must do is "'give

plausible support to a minimal inference of discriminatory motivation.'"  *Vega v. Hempstead

Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir. 2015) (quoting *Littlejohn v. City of N.Y.*, 795 F.3d

297, 311 (2d Cir. 2015)); *see also Doe v. Columbia Univ.*, 831 F.3d 46, 55 n.8 (2d Cir. 2016)

("We have . . . cautioned district courts against imposing too high a burden on plaintiffs alleging

discrimination at the 12(b)(6) stage.") (collecting cases).  Either direct or circumstantial evidence

of discriminatory intent can suffice.  *Vega*, 801 F.3d at 87 (holding even "indirectly showing

circumstances giving rise to an inference of discrimination" would satisfy the plaintiff's burden).

Here, Agnew has cleared this low hurdle, as the allegations in her amended complaint "giv[e] rise to an inference of discrimination." Agnew alleges that no one at DOCCS (including defendants) has denied contact visitation privileges to a male attorney for hugging his clients, accused a male attorney of engaging in inappropriate physical conduct for having done so, or falsely accused a male attorney of engaging in sexually inappropriate behavior whatsoever during legal visits. FAC ¶¶ 27, 148, 151. While both Agnew (a woman) and Morrison (her male colleague) have hugged (male) clients during legal visits at Marcy, defendants accused only her of inappropriate behavior and barred only her from continuing to have contact visits. *Id.* ¶ 149. Indeed, D'Amore's stated rationale for denying Agnew's contact visitation privileges—a decision supported by Silipo's, Dillon's, and Auricchio's writings and ultimately ratified by Sheehan—was that she had been sexually inappropriate with inmates. *Id.* ¶ 128. Considered together, and drawing all reasonable inferences in Agnew's favor, these allegations support the conclusion that defendants harbored discriminatory intent.

Defendants argue that Agnew "merely offers a generalization that male attorneys are treated differently in the Marcy CF visiting room without any substantiation" and that she makes no reference to prior scenarios involving "a male attorney [who acted] inappropriately with incarcerated individuals" or "who was documented to act inappropriately at Marcy." Dkt. No. 40-1 at 18. But these points miss the mark.

Defendants overlook the standards imposed at the pleading stage. "*Iqbal* does not require that the inference of discriminatory intent supported by the pleaded facts be *the most plausible* explanation of the defendant's conduct. It is sufficient if the inference of discriminatory intent is plausible." *Doe*, 831 F.3d at 57 (emphasis in original). And in assessing plausibility, the Court must presume the veracity of the complaint's factual allegations, *Erickson*, 551 U.S. at 94, and

draw all reasonable inferences in the non-movant's favor, *Goel*, 820 F.3d at 559. Accordingly, in evaluating Count Two, the Court accepts what Agnew has offered so far as sufficient factual material from which to draw the reasonable inference of discriminatory intent. In so doing, the Court rejects the idea that she must identify a comparator who has "act[ed] inappropriately," since she contends, strenuously and repeatedly, that she did not do so.

Given the circumstantial nature of the allegations, the Court considers defendants' discriminatory intent a close question. Further discovery, or even a neutral evaluation of the existing evidence in a different procedural posture, may tip the scales in the other direction. But considering the early stage of the litigation, an inference of discriminatory intent is plausible, and defendants' response—begging the question whether Agnew acted inappropriately in the first place—does not aid them. Thus, defendants' motion to dismiss must be denied.

**D.    Agnew Has Adequately Pleaded a Selective-Enforcement or Class-of-One Claim**

Count Three alleges that defendants singled out Agnew for mistreatment based on impermissible factors in violation of the Fourteenth Amendment. FAC ¶¶ 168–74. Agnew pleads this claim under either a selective-enforcement theory, citing *LeClair v. Saunders*, 627 F.2d 606 (2d Cir. 1980), or a class-of-one theory, citing *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000). *Id.* at 28. In opposition, defendants focus on Agnew's failure to identify a comparator who behaved in a sexually inappropriate manner, as they contend she did. *See* Dkt. No. 40-1 at 19–22. But, again, this argument must fail at the pleading stage.

**1.    Agnew Can Proceed Under a Selective-Enforcement Theory**

A plaintiff adequately pleads a selective-enforcement, or *LeClair*, claim when she plausibly alleges "that (1) [she], compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race,

religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *See* 627 F.2d at 609–10. "As this test makes clear, '[t]he *LeClair* type of equal protection claim requires proof of disparate treatment and impermissible motivation.'" *Hu v. City of N.Y.*, 927 F.3d 81, 91 (2d Cir. 2019) (quoting *Bizzarro v. Miranda*, 394 F.3d 82, 87 (2d Cir. 2005)).

### a.    Agnew Has Alleged "Disparate Treatment" by Identifying a Comparator

For a *LeClair* claim, "'the plaintiff's and comparator's circumstances must bear a reasonably close resemblance.' They need not, however, be 'identical.'" *Hu*, 927 F.3d at 96 (quoting *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230 (2d Cir. 2014)). Thus, "[a] plaintiff can prevail by showing that 'she was similarly situated in all material respects to the individuals with whom she seeks to compare herself.'" *Id.* (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)).

As discussed above, because of this litigation's early procedural posture and Agnew's repeated denials of inappropriate behavior, the relevant comparator in this case is not another attorney who behaved sexually inappropriately. *Cf.* Dkt. No. 40-1 at 19–22. Other attorneys who represented Marcy inmates and behaved similarly to Agnew, for example by hugging clients during legal visits, would suffice. And contrary to defendants' assertions, Agnew has identified one such comparator: Morrison, the male attorney who—not just like Agnew, but often alongside her—worked at the same law firm, represented the same clients, traveled to Marcy on multiple occasions, conducted legal visits there, and hugged some of the same inmates, but who—unlike Agnew—was not the subject of allegedly false accusations of sexual impropriety and did not have his contact visitation privileges revoked. *See, e.g.*, FAC ¶ 149.

Thus, Morrison bore at the very least a "reasonably close resemblance" to Agnew and Count Three adequately pleads the first element of a *LeClair* claim.  *See Hu*, 927 F.3d at 96.

### b.    Defendants Allegedly Acted with "Impermissible Motivation"

Count Three also satisfies the second element, *i.e.*, that the selective treatment was based on impermissible factors.  As discussed at length in the sections above with respect to Agnew's claims of retaliation and discrimination, Agnew has plausibly alleged that defendants barred her from conducting contact visits at Marcy based in part on her protected advocacy and in part on her sex.  Either or both bases for singling out Agnew for enforcement of the Directive would constitute an "impermissible consideration" in satisfaction of the second element of a *LeClair* claim.  *See* 627 F.2d at 609–10 (listing, among other improper factors, "race, religion," and the "intent to inhibit or punish the exercise of constitutional rights").

As such, Count Three adequately states a *LeClair* claim and defendants' motion to dismiss must be denied.

### 2.    Agnew Can Also Proceed Under a Class-of-One Theory

A class-of-one, or *Olech*, claim will survive a motion to dismiss when a plaintiff plausibly alleges that (1) "she has been intentionally treated differently from others similarly situated," and (2) "there is no rational basis for the difference in treatment."  *See* 528 U.S. at 564.  "An *Olech* claim asserts that the distinction between the plaintiff's case and those similarly situated is so arbitrary and irrational that it fails to pass even the 'minimal' equal protection standard: that distinctions among the objects of government action must be rationally related to a legitimate government objective."  *Hu*, 927 F.3d at 94.  Count Three satisfies this test, too.

### a.    Agnew's Comparator Is Nearly Identical

For an *Olech* claim, "the level of similarity between plaintiffs and the persons with whom they compare themselves must be extremely high." *Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005), *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 138, 140 (2d Cir. 2008) (per curiam) (internal quotations omitted). Thus, a plaintiff must "show that: (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake." *Id.* at 105.

Agnew plausibly states a claim here, too, even considering *Olech*'s stringent comparator requirement. True, her broad allegations about DOCCS officials' disparate treatment of male attorneys likely would not satisfy the test. *See* FAC ¶¶ 27, 148, 151. But no matter. As detailed above, her amended complaint identifies one all-but-identical comparator: Morrison, the male attorney who worked at the same firm, represented the same clients in the same matters against the same defendants, visited the same inmates at Marcy, and interacted with them in essentially the same ways as Agnew, including hugging, but who was not the subject of allegedly false allegations of sexual misconduct and whose contact visits were not limited. *See id.* ¶ 149.

Thus, this case differs from *Hu*, where the Second Circuit affirmed the dismissal of an *Olech* claim alleging selective enforcement of city building codes based on personal and racial animus brought by an Asian construction worker and Asian-owned companies. 927 F.3d at 86. There, the plaintiffs alleged that the defendant had issued them a notice of violation for having a pool of water at a jobsite, while white workers, who also had a pool of water at the same jobsite on a different occasion, received no such notice. *Id.* at 96. The Circuit found the *Olech* claim

unavailing because the complaint omitted any allegations about whether the white workers performed "the same type of work," whether the defendant observed them for the same amount of time, or whether they had the same employer. *Id.* at 100; *see also Progressive Credit Union v. City of N.Y.*, 889 F.3d 40, 50–51 (2d Cir. 2018) (holding insufficiently identical comparator for the purposes of an *Olech* claim medallion taxis and for-hire vehicles, based on different degrees of regulation and manners of engaging customers). But no similar omissions or potentially meaningful distinctions exist here.

### b.    Defendants Allegedly Lacked a Rational Purpose

As to the second prong, "unlike a malice-based *LeClair* claim, an *Olech* claim does not require proof of a defendant's subjective ill will towards a plaintiff." *Hu*, 927 F.3d at 93. It is enough to plead that officials lacked a rational basis for their conduct. *Olech*, 528 U.S. at 564. Here, Agnew is so like Morrison, her male comparator, that a reasonable person would not conclude that the differential treatment resulted from a legitimate government policy. *See Nielson*, 409 F.3d at 104.

Further, actions that "are not based on any legitimate government policy—[that] indeed, are based on wholly fabricated and unsupported claims—and were definitely not the product of any error" lack a rational basis. *Doe v. Vill. of Mamaroneck*, 462 F. Supp. 2d 520, 559 (S.D.N.Y. 2006). In *Doe*, the trial court concluded that village officials who had initiated or intensified law enforcement operations against a largely Latino group of day laborers, based on entirely unfounded claims about their numbers, residencies, and effects on crime rates, lacked a rational basis for their actions. *Id.* at 524–31, 535, 559. That analysis echoes here, as Agnew alleges defendants made up their accusations to justify revoking her contact visitation privileges, pointing to the letterhead on which Silipo, Auricchio, and Dillon wrote the backdated

memoranda as evidence of their falsity. Alongside Agnew's denials of the underlying acts, this is more than enough to allege that defendants lacked a rational basis for their actions.

Thus, Agnew can also proceed under an *Olech* theory, and defendants' motion to dismiss Count Three must be denied.

V.     **CONCLUSION**

Agnew has plausibly alleged that D'Amore, Silipo, Dillon, Auricchio, and Sheehan retaliated against her in violation of her First Amendment rights, discriminated against her on the basis of her sex in violation of her Fourteenth Amendment rights, and singled her out for mistreatment based on impermissible factors in violation of her Fourteenth Amendment rights.

Therefore, it is

ORDERED that defendants' motion to dismiss (Dkt. No. 40) is DENIED.

The Clerk of the Court is directed to terminate the pending motion and set an answer deadline.

**IT IS SO ORDERED.**

Dated: May 21, 2025
          Utica, New York.

Anthony J. Brindisi
U.S. District Judge

- 32 -